**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRUSTEES OF THE ELECTRICAL
WORKERS LOCAL NO. 26 PENSION
TRUST FUND, *et al.*,

        Plaintiffs,

        v.

TRUST FUND ADVISORS, INC *et al.*,

        Defendants.

Civil Action No. 03-2662 (GK/JMF)

**MEMORANDUM OPINION**

Before me is the defendants' <u>Joint Renewed Motion to Compel</u> [#139] ("MTC").

**I. Background**

William P. Dale ("Dale"), of the firm McChesney & Dale, has represented the International Brotherhood of Electrical Engineers ("IBEW") Local 26 Pension Plan ("the Plan" or "the Fund") [1] and the Operating Engineers Pension Trust Fund since 1978 or 1979. Declaration of William P. Dale ("Dale Dec.") ¶ 4.   On November 1, 2001, Dale wrote a letter to the Trustees of the Plan that set forth his legal analysis of whether suit should be brought against these defendants. <u>Local 26 Fund's Opposition to Defendants'</u> <u>Renewed Joint Motion to Compel Documents and Deposition Testimony Withheld as</u> <u>Privileged</u> [#142] ("Opp.") at 6.   Plaintiffs have resisted producing the letter and have also redacted what they describe as material "reflecting legal advice and work product" from documents that they have produced including (a) the Board of Trustees' meeting minutes;

---

[1] The documents provided by plaintiffs, in support of their opposition, utilize the terms "fund" and "plan" interchangeably to refer to International Brotherhood of Electrical Engineers ("IBEW") Local 26 Pension Plan; therefore, this opinion, in quoting the record, will also use the terms interchangeably.

(b) handwritten notes taken by Fund Administrators at the Trustees' meetings that reflect discussion of these topics; (c) Dale's internal memos to his file following the Trustees' meeting; and (d) communications between Dale and Edward Godfrey "reflecting confidential communications made for the purpose of seeking legal advice." Id.   Plaintiffs emphasize that the redactions they made are no greater than necessary to protect the privileges claimed and that they have been faithful to the obligations to produce factual matter and to withhold only information that is privileged because of the attorney-client or work-product privileges. Id.   Defendants, nevertheless, have moved to compel the withheld information.

It is helpful to divide their arguments into two categories.   The first category concerns whether the information at issue was privileged in its creation, while the second deals with whether, assuming it was privileged, it should nevertheless be forfeited (a word much more useful than "waived") because of acts or omissions by plaintiffs after the creation of the information.

## II. Discussion

In this opinion, I will first deal with whether this record permits the conclusion that no privilege should attach to the information in categories (a) through (d) above.   As will be indicated, I will call for the *in camera* production of the documents at issue to test the accuracy of the representations of plaintiffs as to the nature of what they withheld or redacted.   Ordinarily, I would enforce stringently the requirement of Federal Rule of Civil Procedure 26(b)(5)(A)(ii) that the party claiming a privilege "describe the nature of the documents, communications or tangible things not produced or disclosed–and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."   See Fed. R. Civ. P.

26(b)(5)(A)(ii).   In this case, however, there has already been substantial discovery, which, as I understand it, is nearly complete, and there are not many remaining documents at issue in this motion to compel.   In the interest of an expeditious resolution and crediting the representation that the amount of information at issue is relatively small, I will look at the documents myself.   Before I do, however, I must resolve the issues of whether the circumstances of their creation or their subsequent use vitiate any claim of privilege, leaving for later my evaluation of the privilege claim based on the documents themselves.

A. <u>Did the privilege exist in the first place?</u>

1. *Non-client consultants to the Plan*

In his declaration, Dale explains that he has served as counsel to the plaintiffs, the IBEW Local 26 Pension Plan and the Operating Engineers Pension Plan for thirty years. Dale Dec. ¶ 4. The assets of the two pension plans are held and administered by a Board of Trustees, and the Board must be comprised of equal representation of labor and management, pursuant to provisions of the Taft-Hartley Act that are applicable to multi-employer benefit funds. <u>Id.</u> ¶ 5.

While Dale views himself as representing the Broad of Trustees, he sees himself more truly as the attorney for the plans themselves, even where representing the interests of the plans would be inconsistent with any "actual or proposed actions by the Board of Trustees." <u>Id.</u> ¶ 9.   He believes that he represents "the interests of the participants and beneficiaries of the Plan because it is part of [his] obligation to assure that the Plan is administered for their sole and exclusive benefit." <u>Id.</u>   Thus, if it should occur that an employer Trustee was, for example, delinquent in an obligation to the Plan, Dale would have to sue him. <u>Id.</u>

Dale also explains that, although the Plan is administered by the Board of Trustees, he considers "the non-voting professional Plan Administrator and other professional advisors and

consultants who provide advice to guide the Board's and the Plan's actions and who themselves act on behalf of the Plan, to be representatives of each client Plan for purposes of my representation and to be beneficiaries of my representation." Id. ¶ 10.

Ronald Bryant, the President of an electrical contractor firm, has been a trustee of the Plan. Opp. at Ex. 1 ("Bryant Decl.").   He also provides further information about the consultants, explaining that this Plan has no paid employees and uses paid consultants to perform duties that would otherwise be done by paid employees, if the Plan had them. Bryant Decl. ¶ 2.   Bryant deems these consultants essential and believes that their ability to communicate freely with Dale is necessary for the proper operation of the Plan, because the consultants may know facts that the trustees do not. Id. ¶ 4.   Dale also speaks more particularly of the persons who functioned as Plan Consultants, Andrew Porter, Edward Godfrey, and the firm of Investment Performance Services, Inc.. Dale Dec. ¶¶ 11-25.

### a. Andrew Porter

According to Dale, Porter, Executive Director of the National Electrical Contractors Association, has been authorized by both the labor and management trustees to attend Board of Trustees' meetings as an advisor and consultant to the Board, with a voice but not a vote at the meetings. Id. ¶ 12.   Dale considered his communications with Porter as privileged as his communications with the Board itself. Id. ¶ 13.   According to Dale, "Mr. Porter's role was no different than a Fund employee who carried out these functions for the Board." Id.

More specifically, Dale explains that the communications that have been withheld are "those reflecting my legal advice to the Trustees of each Plan regarding the decision to terminate defendants and to file suit." Id.   Dale states the following of Porter's participation in that decision:

> When I was formulating my legal advice on these matters,
> Mr. Porter participated in discussions regarding the implications and
> necessity of litigation, and was actively involved in addressing the
> information and context needed in order for me to provide fully informed
> legal advice.   Mr. Porter then participated in the Trustees' discussions
> regarding whether to terminate defendants and replace them with a new
> manager, and, ultimately, whether to take on the significant cost of suit.

Id. ¶ 6.

Porter has also supplied a declaration[2] in which he explains the nature of the services that he provided both the Plan and the Operating Engineers Pension Trust Fund.   He participated in the meetings of the Boards of Trustees and provided them with "information they needed to most effectively perform the duties they owed to the Fund." Opp. at Ex. 3, ("Porter Decl."), ¶ 12.   He also "constantly monitored the Fund to assure that it had the appropriate advisors and consultants, that it continued to maintain its tax-qualified status for the benefit of both its participants and contributing employers" and that the conduct of the Plan's trustees, consultants, contributing employers and participating union members was consistent with the relevant collective bargaining agreement, the plan documents and (to the extent he was aware of them) the appropriate regulatory laws. Id.

Porter also explains that he regularly advised the trustees "regarding actions taken or under consideration pursuant to their fiduciary duties, including actions regarding investment managers," such as these defendants. Id.   While unpaid, Porter considered himself an agent and representative of the plan and communicated with Dale during and outside Board meetings regarding Dale's legal advice and the legal implications of the actions taken or considered. Id. ¶ 15.   Specifically, Porter describes his role in the decision to fire the defendants and to sue them.

---

[2] Opp. at Ex. 3.

> Prior to the termination of the defendants Trust Advisors and Nicholas-Applegate Capital Management by the Trustees of the Local 26 Pension Fund, I participated in discussions with Local 26 Pension Fund counsel William Dale regarding the implications and necessity of litigation, and provided Dale with information and context needed for Dale to provide informed legal advice.   During these discussions, I also received from Dale information that I needed in order to stay fully informed as to all activities of the Local 26 Pension Fund and in order to fulfill my responsibility of assisting the Local 26 Pension Fund in deciding what actions to take.

> Pursuant to my duties as Local 26 Pension Fund Consultant, I also participated in the discussions of the Local 26 Pension Fund Trustees regarding whether to terminate defendants and replace them with a new manager and, ultimately, whether to take on the significant cost of suit. I was particularly interested in these decisions because of the possible financial impact they could have on the Local 26 pension Fund and its ability to meet the pension obligations owed to its participants and beneficiaries.

Id. ¶¶ 24-25.

According to Bryant, Porter, as a consultant,[3] "was authorized and expected to attend" the Trustees' meetings. Bryant Decl. ¶ 15.   Porter was also a member of a two-person Collection Committee, which has the responsibility to insure that the appropriate contributions were made to the Fund.   The Committee also has the authority to monitor and act upon any delinquencies. Id. ¶ 17.   Porter was expected to advise the Trustees in the performance of their fiduciary responsibilities, to communicate with Dale concerning Dale's legal advice, and to monitor the Fund's accounts to insure that it "continued to maintain its tax-qualified status for the benefit of both its participants and contributing employers, and that the conduct of the Fund administrator, trustees, professional consultants, contributing employers and participants was consistent with the relevant collective bargaining agreement, the plan documents, and the appropriate regulatory

---

[3] Porter has since become a member of the Board of Trustees. Dale Dec. ¶ 12.

laws." Id. ¶ 18.   According to Bryant, the Plan would have had to hire an employee had Porter not served as he did. Id.

Bryant also indicates that Porter was provided with copies of materials made available to the Trustees and that he expected Porter to remain fully informed as to all important activity involving the Fund, including (a) legal issues that might affect the Fund, (b) investment performance, (c) deductibility of employer contributions, (e) rate of employer contributions, (f) the potential for litigation by or against the Fund, and (g) the potential for increase of benefits for the Fund. Id. ¶ 23.   Thus, while Porter did not have a vote at the Trustees' meeting, "he had a voice in the conduct of the affairs of the Fund, and regularly advised the Trustees regarding actions taken or under consideration pursuant to their fiduciary duties, including actions regarding investment managers" such as the defendants. Id. ¶ 24.   Bryant considered Porter to be the representative and agent of the Fund "for all relevant purposes, including addressing and providing input to the Trustees of the Fund regarding such matters as the propriety of investments, the obligations of employers to make contributions to the fund, and the administration of the plan of benefits." Id. ¶ 25.   Porter participated in the discussion whether to fire the defendants and then to sue them. According to Bryant, "Porter's involvement in these discussions was considered particularly important by the Trustees because of the possible financial impact decisions on these matters could have on the Local 26 Pension Fund and its ability to meet the pension obligations owed to its participants and beneficiaries." Id. ¶ 26.

### b. Edward Godfrey

Dale explains that, in 1997, the Board of Trustees of the Local 26 Pension Plan decided to retain an Investment Consultant "to assist the Board in establishing an asset allocation model, advise the Trustees on the selection of investment managers who are retained pursuant to Section

402(c) of ERISA,[4] monitor the performance of the investment managers, and carry out other related functions." Dale Dec. ¶ 16.   The Board retained the late Edward Godfrey to fulfill this role and, according to Dale, Godfrey "performed the same functions as would be performed by any employee of the Fund hired to advise the Trustees on these investment matters." Id. ¶ 17. Dale communicated with Godfrey regularly both at and outside Board meetings "regarding legal issues that arose regarding the Plan's investments and investment managers." Id. ¶ 19.   Dale considered Godfrey as a fiduciary under ERISA, i.e., one "who renders investment advice for a fee." Id. ¶ 19 (citing ERISA § 2(21)).   According to Dale, Godfrey was not a mere vendor, and his functions were integral to the prudent management of the Plan by the Trustees. Id. ¶ 16-21.   Dale therefore understood that his communications with Godfrey were as much protected by the attorney-client privilege as were his discussions with the Board itself. Id. ¶ 19.   Godfrey was the primary representative of the Plan in its dealings with the defendants and, when Dale learned that the defendants had failed to make certain disclosures that Dale considered required, Godfrey worked with Dale in investigating the matter for the Plan. Id. ¶ 20.   He then worked closely with Dale "regarding this matter from the time of that investigation, through the Trustees' decisions to terminate and then sue the defendants, and continuing after the litigation was filed." Id. ¶ 21.

According to Bryant, Godfrey, as Investment Consultant to the Fund, was expected to represent the Fund in its dealing with organizations, such as the defendants, that were retained to manage the Fund's investments. Bryant Decl. ¶ 11.   In so doing, Godfrey performed a function that would have been performed by a paid employee, had Godfrey not been retained as a consultant. Id.   Godfrey was extensively involved in this litigation and the events that led up to it. Id. ¶ 13.   It was Godfrey who had the responsibility of identifying candidates for investment

---

[4] Employee Retirement Income Security Program ("ERISA"), 29 U.S.C. §§ 1001-1461 (West 2010).

manager, a process that led to the defendants' retention. Id. ¶ 12.   He served as the primary

representative of the Fund in its dealings with the defendants. Id.   It was Godfrey who, with Dale,

investigated the Fund's claim that the defendants had failed to make certain disclosures and

worked closely with the Trustees in making their decision to fire the defendants and file this

lawsuit. Id. ¶ 13.

> i. *Did the presence of Porter and Godfrey and the subsequent distribution to*
> *them of privileged material vitiate the privilege?*

The purpose of the attorney-client privilege is to "encourage full and frank communications

between attorneys and their clients and thereby promote broader public interests in the observance

of law and administration." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).   The privilege

recognizes that "sound legal advice or advocacy serves public ends and that such advice or

advocacy depends upon the lawyer's being fully informed by the client." Id.

Much of America's business is done in the corporate form and that form may dictate the

necessity of corporate counsel receiving accurate information from the corporation's employees or

counsel's giving guidance to employees in what the Supreme Court called the "vast and

complicated array of regulatory legislation confronting the modern corporation." Id. at 392.   It

therefore followed that restricting the privilege to those corporate employees who were within a

"control group" could not be sustained.   Accordingly, in the Upjohn case, the "light of reason and

experience" that Federal Rule of Evidence 501 requires be used in the interpretation of the common

law attorney-client privilege rejected such a restriction. Id. at 397.   The Court reasoned that it

could (a) cut off information to the lawyer that was crucial to her function as adviser or advocate

and (b) restrict the lawyer from conveying "full and frank advice to the employees who will put into

effect the client corporation's policy." Id. at 392.

Had Porter and Godfrey been paid employees of the Plan, the defendants would have no argument to make.   There would be nothing in the common law privilege, as interpreted by the Supreme Court in Upjohn and by subsequent courts, that would divest the Plan of the attorney-client privilege because Porter and Godfrey, if employees, would have been legitimately present at Board of Trustees' meeting, by invitation of the Trustees.   In fact, like employees, Porter and Godfrey had specific functions and responsibilities that required hearing the advice of counsel and participating in privileged discussions with the Board and counsel.   The only argument that could be made –that even if they were like employees, they were not members of the Board of Trustees– is soundly discarded by Upjohn's rejection of a "control group" test in favor a pragmatic, case-by-case analysis of whether the purpose of the privilege is advanced or retarded by applying it to particular communications.[5]

Nevertheless, defendants insist that Porter's and Godfrey's presence at the meetings and their subsequent receipt of the minutes nullifies the privilege because they were unpaid consultants. In so asserting, defendants rely upon the principle that a client cannot have a reasonable expectation that a communication is privileged and confidential, when uttered in the presence of a third party, defined in this context to mean any person with whom the lawyer does not have an attorney-client privilege.

There is nothing in the "reason and experience" used in the interpretation of a common law privilege under Federal Rule of Evidence 501 that suggests that extending the privilege to a paid employee but not a consultant is reasonable.   The Plan is said to have had no full-time employees, but the uncontradicted record indicates that Porter and Godfrey performed functions that would

---

[5] Id. at 397.

have been performed by high-level managers with significant responsibilities had the Plan conducted its business in a more traditional corporate setting.   See, e.g., Dale Dec. ¶ 11.

This Circuit has rejected an interpretation of the privilege that makes its application a direct function of whether the person providing or receiving the information to or from counsel is employed by the corporation. Fed. Trade Comm'n v. GlaxoSmithKline, 294 F.3d 141, 147-48 (D.C. Cir. 2002).   In making their claim of privilege, plaintiffs rely on an Eighth Circuit Court of Appeals decision, In re Beiter Co., 16 F.3d 929 (8th Cir. 1994), which extended the protection of the attorney-client privilege to a consultant by finding that the consultant was the functional equivalent of an employee. Id. at 933-38.   Defendants quarrel with that interpretation, but there is no reason to go so far from home.   Somehow, in their briefs, both parties missed precedent in the District of Columbia Circuit that is directly on point.

In Fed. Trade Comm'n v. GlaxoSmithKline, the district court had concluded that the holder of the privilege had forfeited it by sharing the privileged documents with its consultants.   The court of appeals, however, reversed that decision.   It concluded:

> Our conclusion that the documents are protected by the attorney-client privilege extends also to those communications that [GlaxoSmithKline ("GSK")] shared with its public relations and government affairs consultants.   The Kinzig affidavit notes that GSK's corporate counsel "worked with these consultants in the same manner as they d[id] with full-time employees; indeed, the consultants acted as part of a team with full-time employees regarding their particular assignments" and, as a result, the consultants "became integral members of the team assigned to deal with issues [that] . . . were completely intertwined with [GSK's] litigation and legal strategies."   In these circumstances, "there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice."   See In re Copper Market Antitrust Litig., 200 F.R.D. 213, 219 (S.D.N.Y. 2001).

Id. at 148.[6]

Thus, under the law of this Circuit, that Porter and Godfrey were consultants, rather than employees, is irrelevant to the analysis.   Nor are there any rules in this Circuit, as defendants suggest[7] by applying non-binding decisions from other courts, which specify when a non-employee's presence at a meeting with counsel or her reviewing a privileged document defeats the privilege.   Such arbitrary rules would resurrect the very method that the Supreme Court rejected in Upjohn of making the attorney-client privilege a function of uncertain "tests," as opposed to applying its purpose to the idiosyncratic facts of each case.   The only question presented is whether the presence of Porter and Godfrey at the Trustees' meeting, while the Trustees and Dale were having privileged communications, or Porter's and Godfrey's review of the subsequent minutes that memorialized those discussions, is consistent with the purpose and traditional interpretation of the common law attorney-client privilege.

While defendants dismiss their statements as self-serving, Porter, Dale and Bryant have attested under oath to the nature of their and the late Godfrey's work and participation in the Board of Trustees' meetings.   Bryant, a Trustee, explains how the nature of their responsibilities led the Board to have them present at the meeting and to expect that they would consult with and provide information to counsel and participate in the discussions Dale led at the meetings in his capacity as counsel, such as the decision to fire the defendants and institute this lawsuit.   Dale explains why he considered his communications with them to be privileged and how Godfrey was involved in hiring the defendants in the first place, investigating their asserted failure to make certain disclosures, and

---

[6]  Accord McCaugherty v. Siffermann, 132 F.R.D. 234, 239 (N.D. Ca. 1990).

[7]  See Reply Memorandum in Support of Defendants' Renewed Joint Motion to Compel Documents and Deposition Testimony Withheld as Privileged by the Local 26 Plaintiffs [#146] ("Reply") at 7 & n.3.

in deciding to fire them and start this lawsuit.   Porter, for his part, explains his significant responsibilities in guiding the Trustees as to their fiduciary responsibilities and their compliance with pertinent laws and regulations.   He, too, participated in the discussions leading up the Board's firing and then suing the defendants.

There is simply no good reason to deny the Board its protection of the privilege because of the presence of Porter and Godfrey.   They were not present to serve coffee; both of them seem to have had significant managerial responsibilities that would have been done by high-level corporate managers, had the Plan been incorporated.   Denying the protection of the privilege to the Board because of their presence defeats the reasonable expectations of the Board.   Common sense and experience do not suggest any cogent reason why the Board of Trustees would have thought that Porter's and Godfrey's presence at meetings where matters that fell within their expertise and experience were being discussed would defeat the privilege that would otherwise attend the Board's discussions with counsel.   Moreover, the Board relied on them for important work that often required legal guidance.   Recognizing the privilege in this context certainly advances the purpose of the attorney-client privilege –encouraging a frank discussion– without creating any potential for its misuse.

Although the law requires that the privilege be narrowly construed because it hinders the search for the truth, it hardly follows that making the privilege a function of whether a person was an employee or an unpaid consultant effectuates the policy the privilege is said to serve.   While defendants can complain that this will obstruct them from learning every thing that happened at the Board meetings, that is true of any occasion where the privilege is successfully asserted.   Such an obstruction may be a reason to abolish the privilege, but it is not a legitimate argument in favor of the arbitrary limitation that the defendants propose in this case.

I therefore conclude that the presence of Porter and Godfrey at the Trustees' meetings does not defeat the protection of the attorney-client privilege of those documents, including portions of the minutes, which would otherwise be protected by the attorney-client privilege.

### B. Were the privileges lost?

Having concluded that the presence of Porter and Godfrey did not vitiate the existence of the privilege, I turn now to defendants' claim that plaintiffs' actions have forfeited the attorney-client and work-product privileges.[8]

---

[8] Defendants also argue that the court should order the production of the documents that were not accurately described on plaintiffs' initial privilege log or not included on plaintiffs' most recent log. MTC at 28.   Defendants base their argument on three cases, Sec. & Exch. Comm'n v. Beacon Hill Asset Mgmt. LLC, 231 F.R.D. 134, 144-45 (S.D.N.Y. 2004),   Benton v. Brookfield Props. Corp., No. 02-CV-6862, 2003 WL 21749602, at *1 (S.D.N.Y. July 29, 2003), and Bowne, Inc. v. Ambase Corp., 150 F.R.D. 465, 474-76 (S.D.N.Y 1993).   These cases, however, do not support the production defendants seek.   In Beacon Hill Asset Mgmt., the court ordered a number of documents produced because the descriptions in the privilege log were insufficient to sustain the assertion of privilege. Beacon Hill Asset Mgmt., 231 F.R.D. at 145.   The court found that the description "communications with counsel" did not establish the minimal showing required because it did "not permit the adversary to make an intelligent assessment as to the applicability of the privilege;" some descriptions did not even "remotely suggest any privilege or protection" was applicable. Id.   In the same case, the court found that other descriptions on the log were sufficient, and production of those documents was not ordered. Id.   The court in Benton raised the specter of waiver because the defendants had made representations to the court that they would not withhold any documents as privileged, and the court, relying on those representations, absolved the defendants of the burden to produce a log. Benton, 2003 WL 21749602, at *1.   The court did not, however, order the documents produced on this basis. Id.   Finally, in Bowne, Inc., the court found the defendant's showing of privilege, including through the privilege logs, to be inadequate and provided the defendant "one last opportunity to make a proper showing." Bowne, Inc., 150 F.R.D. at 475-76.   Defendants in the instant case do not argue that the whole privilege log is inadequate but that there are some inaccuracies or items not included on the log.   I have previously found that the failure to produce a privilege log does not justify the harsh sanction of the production of privileged documents.   See Smith v. Cafe Asia, 256 F.R.D. 247, 251 (D.D.C. 2009) (citing United States v. Philip Morris, Inc., 347 F.3d 951, 954 (D.C. Cir. 2003).   Instead, such a sanction is reserved for cases of unjustified delay, inexcusable conduct, or bad faith.   There is no assertion that the mistakes in plaintiffs' privilege log were due to bad faith.   I will not, as the defendants request, order the production of privileged documents based on inaccuracies or inadequacies in the privilege

### 1.  *Only the disclosure of privileged information can work a forfeiture*

Unfortunately, there is a fundamentally mistaken premise that underlies all of the defendants' arguments that flows from a misunderstanding of the circumstances under which the attorney-client and work-product privileges are forfeited or waived.   Defendants continually insist that the plaintiffs are required to disclose privileged documents because they have previously disclosed other non-privileged documents that deal with the same subject matter.   See, e.g., Reply at 19.[9]   Thus, according to defendants, if a disclosed document and an undisclosed document deal with the same subject matter, the undisclosed privileged document must be produced because it and the non-privileged disclosed document deal with the same subject matter. Id.   Defendants therefore protest the "unfairness" of (1) plaintiffs withholding, as privileged, a document when they disclosed another document concerning the same subject matter that they did not claim was privileged and (2) plaintiffs' permitting a witness to testify as to a certain matter but asserting privilege as to additional testimony about the same subject matter.   I must resolve this misunderstanding before I go any further because it pervades the defendants' entire approach.

The law prevents the misuse of any privilege by prohibiting a party from disclosing part of a privileged communication and hiding the rest.   A client cannot disclose to the world the first paragraph of a letter from his lawyer because it helps him but decline to produce the rest as privileged because it hurts him.   But, that principle is premised on the disclosure of privileged information in the first place.   If the information in the first paragraph was not privileged, because it was innocuous and did not reveal a confidential communication, then its disclosure could not

---

log alone.

[9] "If the documents produced by Plaintiffs contain subject matter Plaintiffs now deem privileged in the memoranda, Plaintiffs' earlier document production necessarily involved the intentional waiver of the attorney-client privilege at to that subject matter." Reply at 19.

possibly justify revealing that portion of the letter that is privileged.    While it may be sharp dealing to disclose a portion of a privileged communication and not the rest, it is perfectly legitimate for a party to disclose a non-privileged communication but to decline to disclose a privileged communication, even though the privileged communication would prove that the party is lying through his teeth. While that may be unfair, it is how any privilege works.   The search for the truth yields to a privilege when the common law determines that the effectuation of the purpose of the privilege must do so.   Only if the disclosure is of privileged information can it justify the forced disclosure of additional privileged information.   The disclosure of non-privileged information can never do that, for "[i]t goes without saying that merely disclosing non-privileged communications with an attorney does not thereby waive privileged ones." 1 Edna Selan Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 524 (5th ed. 2007) (citing Scherer v. Latter, No. Civ. A. 96-4189, U.S. Dist. Lexis 5985 (E.D. La. Apr. 28, 1998) (disclosing non-privileged communications with lawyer cannot be premise for claim of waiver of privileged communications)).

My initial memorandum opinion explained how Federal Rule of Evidence 502 modified the scope of any forfeiture that arises from the disclosure of privileged information.   The new rule abolishes the dreaded subject-matter waiver, i.e., that any disclosure of privileged matter worked a forfeiture of any other privileged information that pertained to the same subject matter.   Instead, if there has been a disclosure of privileged information, the disclosure of additional privileged information will be required if both documents "concern the same subject matter; *and* (3) they ought in fairness to be considered together." Fed. R. Evid. 502 (a)(2) & (3) (emphasis added).

Putting the principles of privilege and Rule 502 together leads to the conclusion that the disclosure of privilege information may lead to the additional and compelled disclosure of

additional privileged information, if they concern the same subject matter and ought in fairness to be considered together.   The disclosure of privileged information can lead to such a result; the disclosure of non-privileged information can never have that result.   If it could, the privilege would evaporate at the precise moment that it was needed.   In my *in camera* review of the privileged documents, I will consider whether they are in fact privileged and determine whether, if a document deals with the same subject matter as produced documents, fairness nevertheless requires its production in light of the production of *some other privileged information*.   See Fed. R. Evid. 502(a)(3).   Defendants' notion that I should also consider the disclosure of non-privileged information as a waiver by plaintiffs of privileged information that deals with the same subject matter is flat out wrong.

### 2. *Was the privileged information placed at issue?*

The attorney-client and work-product privileges can be forfeited (or, to put it inaccurately "waived"[10]) through behavior by the client or her agent, her attorney, that is inconsistent with the continued maintenance of the privilege.   For example, no one would argue seriously that a client could sue a lawyer claiming malpractice and demand that the lawyer not disclose privileged information in her defense. Epstein, supra, at 554 ("The attorney cannot effectively defend the malpractice claim without revealing the basis for the advice given.   Because communications from the client are a predicate of the advice, the privilege is almost invariably denied.").

In other instances, the client and her attorney may put the privileged information at issue in the lawsuit.   As defendants unfortunately ignore, two schools of thought initially emerged in

---

[10] "'Waiver' suggests a voluntary surrender but '[n]ot so in the case of privilege waivers, where they can and do occur in spite of the privilege holder's insistence that no waiver was intended . . . All in all, the term 'forfeiture' would fit the reality far better than the term waiver.'" Epstein, supra, at 390.

defining when a client puts privileged information at issue.   The argument that a party has put

privileged material at issue is often premised on Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975).

In Hearn, the court held that state officials who asserted qualified immunity as an affirmative

defense to a prisoner's claim of a violation of his civil rights had placed at issue the advice they

received from the Attorney General's office, since legal advice received by defendants is highly

probative of whether they acted with malice. Id. at 581 & n.5.   For the court, this potential

relevancy was sufficient to forfeit the privilege, because the opposing party had met the other

requirements needed to determine that the defendants had "assert[ed] the privilege [and] placed

information protected by it in issue through some affirmative act for his own benefit." Id.

Hearn and the cases following it have their critics.[11]   Significantly, two courts of appeals

have criticized and specifically rejected Hearn.

---

[11] See, e.g., United States v. Ohio Edison Co., No. C2-99-1181, 2002 WL 1585597, at *5
(S.D. Ohio Jul. 11, 2002) (relevancy cannot be test for implicit waiver of attorney-client
privilege; party must affirmatively use privileged communications to defend itself or
attack opponent before it forfeits the privilege); Koppers Co., Inc. v. Aetna Cas. & Sur.
Co., 847 F. Supp. 360, 362-64 (W.D. Pa. 1974), mandamus granted, order vacated without
opinion, 40 F.3d 1240 (3d Cir. 1994); Smith v. Kavanaugh, Pierson & Talley, 513 So.2d
1138, 1145-46 (La. 1987) (finding that Hearn undermines legislatively established
privilege by weighing need and leads to automatic waiver, even without showing or
misuse of the privilege or unfairness); Wardleigh v. Second Jud. Dist. Ct., 891 P.2d 1180,
1186 (Nev. 1995) (finding that the "Hearn test has come under severe criticism" and that
forfeiture occurs only when litigants rely or express the intention to rely upon privileged
information); Aranson v. Schroeder, 671 A.2d 1023, 1030 (N.H. 1995) (quoting Richard
L. Marcus, The Perils of the Privilege: Waiver and the Litigator, 84 Mich. L. Rev. 1605,
1633 (1986) and rejecting Hearn, finding that forfeiture occurs only when
privilege-holder injects the privileged material into the case); Pub. Serv. Co of New
Mexico v. Lyons, 10 P.3d 166, 173-74 (N.M. App. 2000) (rejecting Hearn, the court finds
that a party forfeits privilege only when it seeks to limit its liability by asserting that it
relied on legal advice); Mortgage Guar. & Title Co. v. Cunha, 745 A.2d 156, 159 (R.I.
2000) (rejecting Hearn, the court finds that forfeiture occurs only when party pleads
reliance on counsel's advice as element of claim, testifies concerning the advice, or places
the nature of the attorney-client privilege at issue); Wisconsin v. Hydrite Chem. Co., 582

In <u>Rhone-Poulenc Rorer Inc. v. Home Indem. Co.</u>, 32 F.3d 851 (3d Cir. 1994), the court concluded that forfeiture of the attorney-client privilege occurs when a party has placed the advice of counsel in issue. <u>Id.</u> at 863.   The court adds:

> Advice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner.   The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication.

<u>Id.</u> at 863.

The court then said the following about the <u>Hearn</u> decision:

> Some decisions have extended the finding of a waiver of the privilege to cases in which the client's state of mind may be in issue in the litigation.   These courts have allowed the opposing party discovery of confidential attorney-client communications in order to test the client's contentions.   <u>See, e.g.</u>, <u>Byers v. Burleson</u>, 100 F.R.D. 436 (D.D.C. 1983); <u>Hearn v. Rhay</u>, 68 F.R.D. 574 (E.D.Wash.1975).   These decisions are of dubious validity.   While the opinions dress up their analysis with a checklist of factors, they appear to rest on a conclusion that the information sought is relevant and should in fairness be disclosed.   Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue.
>
> As the attorney-client privilege is intended to assure a client that he or she can consult with counsel in confidence, finding that confidentiality may be waived depending on the relevance of the communication completely undermines the interest to be served. Clients will face the greatest risk of disclosure for what may be the most important matters.   Furthermore, because the definition of what may be relevant and discoverable from those consultations

---

N.W. 2d 411, 418 (Wis. App. 1998) (rejecting <u>Hearn</u>, the court finds that forfeiture occurs only when privilege-holder uses privileged document to prove claim or defense, but does not occur when bringing suit or merely because document may be relevant).

> may depend on the facts and circumstances of as yet unfiled
> litigation, the client will have no sense of whether the
> communication may be relevant to some future issue, and will have
> no sense of certainty or assurance that the communication will
> remain confidential.
>
> A party does not lose the privilege to protect attorney-client
> communications from disclosure in discovery when his or her state
> of mind is put in issue in the action.   While the attorney's advice
> may be relevant to the matters in issue, the privilege applies as the
> interests it is intended to protect are still served by confidentiality.

Id. at 864.

More recently, the Second Circuit in In re the County of Erie, 546 F.3d 222 (2d Cir. 2008),

faced an issue of whether e-mails between the county attorney's office and the Sheriff's

department, reflecting legal advice, were available to plaintiffs in a civil rights action. Id. at 225.

The district court had relied on Hearn in concluding that they were; however, the court of appeals

concluded that Hearn was incorrectly decided. Id. at 229.   The court stated:

> We agree with its critics that the Hearn test cuts too broadly and
> therefore conclude that the District Court erred in applying it here.
> According to Hearn, an assertion of privilege by one who pleads a
> claim or affirmative defense "put[s] the protected information at
> issue by making it relevant to the case." Hearn, 68 F.R.D. at 581.
> But privileged information may be in some sense relevant in any
> lawsuit.   A mere indication of a claim or defense certainly is
> insufficient to place legal advice at issue.   The Hearn test presumes
> that the information is relevant and should be disclosed and would
> open a great number of privileged communications to claims of
> at-issue waiver.   Nowhere in the Hearn test is found the essential
> element of reliance on privileged advice in the assertion of the claim
> or defense in order to effect a waiver.
>
> We hold that a party must rely on privileged advice from his counsel
> to make his claim or defense.

Id. at 229.

I believe that the court of appeals for this Circuit would agree with the decisions of the Second and Third Circuits and with the courts and academics that have criticized <u>Hearn</u> and would conclude that a party must put the advice in issue before she forfeits the privilege.   There is no such claim here; plaintiffs have not asserted a claim or a defense based on Dale's advice.   Indeed, this case illustrates how much damage <u>Hearn</u> can do.   This is not a situation where a party is using a portion of privileged information for its own benefit to assert a claim or defense and withholding that which will hurt that claim or defense.   But, if <u>Hearn</u> is right and relevancy is the only criterion to consider, then in this case counsel's giving advice and his clients' relying on it would in itself constitute a waiver of the confidentiality of that advice even though plaintiffs are predicating neither a claims or a defense on that advice.   <u>Hearn</u> therefore modifies the absolute attorney-client privilege the common law recognizes to one that is defeasible upon a showing of need and relevance.   Doing that is not a legitimate interpretation of the attorney-client privilege but is a modification of its very essence without legislative authority.

### 3. *Was the work-product privilege forfeited?*

The attorney-client and work-product privileges serve different societal interests.   As explained above, the attorney-client privilege is premised upon the hope that encouraging the client to be as candid as possible with counsel will make it more likely that the client will follow the well-informed advice of counsel.   <u>See, e.g.</u>, <u>Upjohn</u>, 449 U.S. at 389; <u>see also</u> <u>Coastal States Gas Corp. v. Dep't of Energy</u>, 617 F.2d 854, 862 (D.C. Cir. 1980).   The work-product privilege, on the other hand, creates a zone of privacy around counsel who is anticipating litigation or preparing for trial, where her "mental impressions, conclusions, opinions, or legal theories" are inviolate from her opponent's intrusion. Fed. R. Civ. P. 26(b)(3).   The shield created serves the societal interest in effective advocacy.   The Supreme Court explained in <u>Hickman v. Taylor</u>, 329 U.S. 495 (1947):

> In performing his various duties, however, it is essential that a
> lawyer work with a certain degree of privacy, free from unnecessary
> intrusion by opposing parties and their counsel. Proper preparation
> of a client's case demands that he assemble information, sift what he
> considers to be the relevant from the irrelevant facts, prepare his
> legal theories and plan his strategy without undue and needless
> interference.   That is the historical and the necessary way in which
> lawyers act within the framework of our system of jurisprudence to
> promote justice and to protect their clients' interests.   This work is
> reflected, of course, in interviews, statements, memoranda,
> correspondence, briefs, mental impressions, personal beliefs, and
> countless other tangible and intangible ways -aptly though roughly
> termed by the Circuit Court of Appeals in this case (153 F.2d 212,
> 223) as the 'Work-product of the lawyer.'   Were such materials
> open to opposing counsel on mere demand, much of what is now put
> down in writing would remain unwritten.   An attorney's thoughts,
> heretofore inviolate, would not be his own.   Inefficiency,
> unfairness and sharp practices would inevitably develop in the
> giving of legal advice and in the preparation of cases for trial.   The
> effect on the legal profession would be demoralizing.   And the
> interests of the clients and the cause of justice would be poorly
> served.

Id. at 510-11.

The two privileges address different societal interests.   Therefore, the conclusion that the

presence of a third party during confidential communications between attorney and client or the

sharing of a confidential communication with a third party defeats the attorney-client privilege does

not apply to a claim of forfeiture of the work-product protection. United States v. Amer. Tel. & Tel.

Co., 642 F.2d 1285, 1299 (D.C. Cir. 1980) ("A disclosure made in the pursuit of such trial

preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed

without waiver of the privilege.   We conclude, then, that while the mere showing of a voluntary

disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it

should not suffice in itself for waiver of the work-product privilege.") (hereinafter AT&T).   In

AT&T, the district court concluded that MCI's sharing of its attorney work-product with the United

States forfeited MCI's right to assert the work-product privilege to protect documents requested by

22

AT&T from the United States. Id.   The court of appeals reversed, concluding that common interests that MCI and the United States had against their common adversary, AT&T, meant that MCI's disclosure to the United States was perfectly consistent with maintaining the secrecy of the work-product from that common adversary. Id. at 1300.

AT&T was followed in Rockwell Int'l Corp. v. U.S. Dep't of Justice, 235 F.3d 598 (D.C. Cir. 2001), where the claim was made that the Department of Justice had forfeited its work-product privilege when it disclosed its work-product in rebutting claims made against it in a Congressional committee report.   The court of appeals rejected the forfeiture, invoking the AT&T case for the principle that the work-product privilege is forfeited only when the disclosure is inconsistent with maintaining the secrecy of the work-product from the disclosing party's adversary. Id. at 605; accord United States v. Deloitte & Touche, 623 F. Supp. 2d 39, 41 (D.D.C. 2009).   The court concluded that disclosure by the executive branch of the government to the legislative branch did not meet this requirement, and it distinguished cases involving the actual testimonial use of work-product in an adversarial proceeding. Rockwell Int'l Corp, 235 F.3d at 605-06.

In the cases distinguished in the opinion and in other pertinent cases, forfeiture or waiver occurred because 1) there was testimonial use of privileged documents, 2) the party resisting disclosure could not have reasonably expected that its claim of privilege would be sustained, or 3) some greater societal interest overwhelmed the interest in preserving the privilege.   See United States v. Nobles, 422 U.S. 225, 239 (1975) (defense's calling of investigator to testify to his interviews with prosecution witness required disclosure to prosecution of his report of those interviews, because defense had made testimonial use of the investigator's work-product); United States v. The Williams Co., 562 F.3d 387, 395 (D.C. Cir. 2009) (work-product privilege yields to government's obligation to provide the defendant with exculpatory information when disclosure is

not inconsistent with agreement between government and party that provided information to the government); In re Sealed Case, 676 F.2d 793, 807 (D.C. Cir. 1982) (revelation of part of a document to gain unfair advantage is intolerable; corporation participating in SEC disclosure, thereby gaining favorable treatment, could not reasonably expect SEC would not investigate bona fides of corporation's representations to it).

In In re Sealed Case, there was still a full acknowledgment that the work-product privilege, unlike the attorney-client privilege, is not forfeited by disclosure of the privileged information to a third-party. In re Sealed Case, 676 F.2d at 807.   The disclosure instead must be to a party who is an adversary or does not have a common interest with the party claiming the privilege.[12] Id.

Defendants also raise concern that the privilege has been waived due to Dale's sharing of information between trustees for the Operating Engineers Plan and the Plan. MTC at 36-37.   I have previously considered the common law meaning of "common interest" in regards to the preservation of privilege.   See Miller v. Holzmann, 240 F.R.D. 20, 22-23 (D.D.C. 2007).   There is no clear uniformity in the case law "as to when parties share a common interest and how that interest is to be defined." Id. (citing Katherine Taylor Schaffzin, An Uncertain Privilege: Why the Common Interest Doctrine Does Not Work and How Uniformity Can Fix It, 15 B.U. Pub. Int. L.J. 49, 61-65 (2005)).   Even without exact uniformity, the court of appeals' ruling in AT&T makes clear that the privilege is protected "so long as 'transferor and transferee anticipate litigation against a common adversary on the same issue or issues.'" Miller, 240 F.R.D. at 22 (citing AT&T, 642 F.2d at 1299 (D.C. Cir. 1980)).   There is no clearer example of when the privilege is protected than in

---

[12] Defendants also argue that the disclosure of documents to plaintiffs in the related case, Trustees of the Operating Engineers Pension Trust Fund et al. v. Trust Fund Advisors, Inc. et al., No. 04-CV-628, and Operating Engineers' counsel's failure to list the documents on their privilege logs waives the protection. As explained, I will not conclude that inadequacies in the privilege log will work a forfeiture of the privilege.

this case, where the transferor and transferee are engaged in related litigation against a common adversary on the same issue or issues.

Thus, in an unbroken string of precedents, which the defendants remarkably and mysteriously ignore, the court of appeals has held that a party only forfeits the work-product privilege by a disclosure of privileged information in a manner that is inconsistent with preserving the secrecy of that information from an adversary.   Disclosure to a person who shares a common interest with the party claiming the privilege cannot therefore work a forfeiture.

Furthermore, as defendants also ignore, more than twenty years before the enactment of Rule 502 of the Federal Rules of Evidence, Judge Hogan concluded that, as Rule 502 provides, the disclosure of privileged work-product information does not extend to other privileged information merely because they pertain to the subject matter. In re United Mine Workers of Am. Employee Benefit Litig., 159 F.R.D. 307, 311 (D.D.C. 1994).   He rejected the superficial argument that In re Sealed Case, 676 F.2d at 1818, created such a subject-matter waiver and concluded instead:

> Unlike the In re Sealed case, 676 F.2d at 817, this is not a situation where a party expressly agreed to disclose attorney work-product or where it deliberately disclosed documents in an attempt to gain a tactical advantage.   In fact, the documents that have been disclosed are unhelpful to plaintiffs' position.   A complete subject-matter waiver would probably yield additional attorney work-product that would provide the defendants with a substantial strategic windfall. Where, as here, the law does not mandate a subject-matter waiver and such a waiver is more likely to undermine the adversary system than to promote it, it was contrary to law for the Magistrate Judge to extend the waiver of attorney work-product to encompass previously undisclosed documents related to the same subject matter.

In re United Mine Workers of Am. Employee Benefit Litig., 159 F.R.D. at 312.

When these principles are applied to the instant case, defendants' claim of waiver of the work-product privilege collapses.   Indeed, since defendants asks the court to impose the very

subject-matter waiver of all work-product-protected information rejected by Judge Hogan, their horse never breaks from the gate.   Even before the enactment of Rule 502, there was no such absolute subject-matter waiver. See United States ex rel Fago v. M&T Mort. Corp., 235 F.R.D. 11, 17 (D.D.C. 2006) (subject-matter waiver of work-product privilege never is automatic; waiver should never be greater than needed to protect the adversary system).   After enactment of Rule 502, the questions are whether the disclosed and undisclosed information concern the same subject matter and whether they ought in fairness to be considered together.   Thus, there is not now, and there has never been, the absolute subject-matter waiver that supposedly flows from the disclosure of work-product.

Moreover, defendants premise "waiver" not on the disclosure of work-product –the absolute precondition for the waiver it seeks– but on the use by Dale of his work-product to do his job.   Defendants premise the waiver on Dale's refusal to disclose the file memoranda or other work-product used to jog his own memory, to formulate a demand letter, to prepare the complaint and to answer and verify the interrogatories.   None of those uses can possibly lead to a waiver. All of them are perfectly consistent with the maintenance of the adversary system.   Dale's use did not occasion or risk disclosure of the work product to Dale's clients' adversaries.   The converse is true; all of the uses are perfectly consistent with the ways in which the lawyers have always used their work-product.   If the defendants are seriously arguing that Dale's use of his work-product constitutes a waiver, then the privilege disappears when it is most needed.   That takes the ruling in Hickman v. Taylor –that a lawyer's work-product must be protected so that she can use it effectively in the representation of her client– and stands it on its head.

I appreciate that the work-product privilege can be lost without disclosure of any work-product when the information protected by the privilege is placed at issue by the party

claiming the privilege.   But, as I have explained, I believe that the court of appeals for this Circuit would conclude that attorney-client privileged information is put in issue only when the party claiming the privilege is premising a claim or defense on that advice.   Since the circumstances under which the work-product privilege is forfeited are more constrained, I am certain that the court of appeals would also conclude that the work-product privilege is lost only when the contents of work-product are the premise of a claim or defense.

Finally, I also appreciate that Dale is wearing two hats in this case as both witness and lawyer and that such a dual role creates complications.[13]   I will vigilantly compare Dale's deposition and all the portions of the other depositions that defendants cite against the undisclosed work-product that will be made available to me.   I am obliged to prevent the situation condemned in United States v. Nobles, where work-product was mistakenly used by the lower court to prevent disclosure of information justifiably needed for cross-examination. Id. at 239-40.   In the meanwhile, I reject defendants' assertions that Dale's use of his work-product leads, as a matter of law, to a subject-matter waiver of all of his work-product.

### III. Conclusion

I therefore reject defendants' claims that the attorney-client and work-product privileges have been forfeited.   Plaintiffs will therefore make available to me *in camera* all documents as to which they claim any privilege.[14]   With that information in hand, I will rule on the privilege claim

---

[13] See, e.g., C&E Services, Inc. v. Ashland, Inc., Civil Action No. 03-1857, 2008 WL 1744600, at *2 (D.D.C. April 14, 2008).

[14] According to defendants, plaintiffs have conceded that factual portions of the memo are not privileged and have agreed to produce those portions. MTC at 30.   In preparing the documents to produce to me *in camera*, I encourage plaintiffs to indicate those portions that they concede contain only factual, non-privileged information.

and will also turn to defendants' claims that certain objections made during the depositions on the grounds of privilege were improper.

Lastly, there is one issue raised in plaintiffs' opposition and defendants' reply memoranda concerning the relevant dates for the purposes of discovery.   I will postpone resolution of this issue until after my *in camera* review and may require further briefing by the parties on this issue. Plaintiffs should therefore produce all withheld privileged documents, regardless of their date of creation, to me for *in camera* review by no later than February 19, 2010.

**SO ORDERED.**

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE